**1**

```
               UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
     vs.                         )  No. 20 CR 566
                                 )
HAIZHOU HU,                      )  Chicago, Illinois
                                 )  September 18, 2020
                Defendant.       )  1:37 o'clock p.m.


                TRANSCRIPT OF PROCEEDINGS -
        Preliminary Examination/Detention Hearing
    BEFORE THE HONORABLE MAGISTRATE SHEILA M. FINNEGAN


APPEARANCES:

For the Government:       HON. JOHN R. LAUSCH, JR.
                          United States Attorney
                          219 South Dearborn Street, Suite 500
                          Chicago, Illinois  60604
                          (312) 886-7631
                          BY:  MS. SHOBA PILLAY

For the Defendant:        LAW OFFICES OF JAMES D. TUNICK
                          BY:  MR. JAMES D. TUNICK
                          650 North Dearborn Street, Suite 700
                          Chicago, Illinois  60654
                          (773) 425-1657

U.S. Pretrial Services:   MR. DANIEL DOMINGUEZ

Official Interpreters:    MS. ROBIN MURPHY and MS. JUSTINE YEN


Also Present:             SPECIAL AGENT MICHAEL BORKAN - FBI



                COLLEEN M. CONWAY, CSR, RMR, CRR
                      Official Court Reporter
              219 South Dearborn Street, Room 1918
                    Chicago, Illinois  60604
                          (312) 435-5594
                  colleen_conway@ilnd.uscourts.gov
```

1      (Defendant in.  Proceedings heard in open court:)

2           THE CLERK:  Case 20 CR 566, U.S.A. versus Haizhou Hu;

3    here for preliminary examination hearing and detention hearing.

4           MS. PILLAY:  Good morning, Your Honor.  Shoba Pillay

5    for the United States.

6           THE COURT:  Good morning.

7           MR. TUNICK:  Good afternoon, Your Honor.  James

8    Tunick on behalf of Haizhou Hu, who's present alongside me.

9           THE COURT:  Good afternoon.

10          All right.  And we have an interpreter here.  Could I

11   have you identify yourself?

12          INTERPRETER YEN:  Yes.  My name is Justine Yen,

13   Mandarin interpreter.

14          INTERPRETER MURPHY:  Good afternoon, Your Honor.

15   Mandarin Interpreter Robin Murphy.

16          THE COURT:  Thank you.

17          All right.  As you know, we're here this afternoon

18   for a detention hearing and a preliminary hearing.

19          Let me ask Mr. Tunick, do you want to go forward now

20   with the detention hearing or is it your preference to go

21   forward with the preliminary hearing first?

22          MR. TUNICK:  Judge, it's my preference to proceed

23   with the preliminary hearing first.

24          THE COURT:  All right.  So, as you know for a

25   preliminary hearing, the sole purpose is for the Court to

1   determine whether there is probable cause to believe that the

2   crime that's charged was committed and that the defendant

3   committed it.

4        This is not a trial, so the Federal Rules of Evidence

5   don't apply and hearsay is permitted.

6        I will have the government call its witness.  And

7   after the government finishes questioning the witness, then

8   defense counsel will have an opportunity.

9        Is there any preliminary issue, logistical or

10  otherwise, that we need to take up before the government calls

11  its first witness?

12       MS. PILLAY:  Briefly, Your Honor.

13       Your Honor's standing order indicated a preference

14  for electronic exhibits.

15       In this case, we intend only to introduce the

16  complaint.  I ask that Agent Borkan be permitted to bring a

17  paper copy of the complaint, which is his copy, with him to the

18  stand for his convenience, as I know Your Honor and defense

19  counsel already have copies of the complaint.  I do have

20  additional copies, but I didn't -- if anyone needs them.

21       THE COURT:  Any objection?

22       MR. TUNICK:  Not at all, Your Honor.

23       THE COURT:  All right.  That request is granted.

24       MS. PILLAY:  Thank you, Your Honor.

25       INTERPRETER CARBAJOSA:  The Interpreters' Office has

1    a logistical issue, Your Honor.  Could we have --

2              THE COURT:  Could you say your name, please.

3              INTERPRETER CARBAJOSA:  Yeah.  Jorge Carbajosa from

4    the Interpreters' Office.

5              Could we have Ms. Murphy start the detention hearing,

6    and could I see Ms. Yen?

7              THE COURT:  Yes.

8              INTERPRETER CARBAJOSA:  Thank you.

9              Ms. Yen, could you please accompany me?

10             INTERPRETER YEN:  I'm sorry?

11             INTERPRETER CARBAJOSA:  Could you come with me, Ms.

12   Yen?

13             INTERPRETER YEN:  Sure.

14             INTERPRETER CARBAJOSA:  Okay.

15             Ms. Murphy, can you begin, please?

16             INTERPRETER MURPHY:  Yes.

17             INTERPRETER CARBAJOSA:  Thank you.

18             Thank you, Your Honor.

19        (Interpreter Yen exits.)

20             INTERPRETER MURPHY:  Wait.  Justine?

21             MS. PILLAY:  Justine?

22        (Interpreter interruption.)

23             THE COURT:  Go ahead.  We'll wait.

24        (Pause.)

25             INTERPRETER MURPHY:  Mr. Hu still could not hear the

1    interpreter.

2            THE COURT:  All right.  Let's take a recess and

3    we'll --

4            MS. PILLAY:  Allison, will you go grab Jorge, please?

5        (Pause.  Technical issue resolved.)

6            THE COURT:  All right.  The government may call its

7    first witness.

8            MS. PILLAY:  Thank you, Your Honor.

9            The government calls Special Agent Michael Borkan.

10           THE CLERK:  Please raise your right hand.

11       (Witness duly sworn.)

12           THE CLERK:  Please be seated.

13           THE COURT:  You may proceed, counsel.

14           MS. PILLAY:  Thank you, Your Honor.

15           Would Your Honor like the witness to remove his mask

16   during his testimony?

17           THE COURT:  You know, I think it depends on whether

18   he wishes to and can be heard, so -- I notice with my mask,

19   it's muffling my voice, so I pull it down.  I do have a court

20   reporter sitting somewhat close.

21           So let's see if you can do it with it on.  And if

22   that's a problem, pull it off.  But I would also invite the

23   court reporter, if you want to move, we could do that, too, or

24   we could move the witness.

25           THE COURT REPORTER:  Your Honor, I'm good.

Borkan - direct

1    THE COURT:  Go ahead.

2    MICHAEL BORKAN, GOVERNMENT'S WITNESS, SWORN

3    DIRECT EXAMINATION

4  BY MS. PILLAY:

5  **Q.**  Good afternoon.  Will you please state and spell your name

6  for the record.

7  **A.**  Michael Borkan, M-i-c-h-a-e-l B-o-r-k-a-n.

8  **Q.**  And where are you currently employed?

9  **A.**  The FBI.

10  **Q.**  What's your current title?

11  **A.**  Special agent.

12  **Q.**  How long have you been a special agent with the FBI?

13  **A.**  Approximately four years.

14  **Q.**  What is your current assignment?

15  **A.**  I'm assigned to a counterintelligence squad.

16  **Q.**  Is that in Chicago?

17  **A.**  In Chicago, correct.

18  **Q.**  And what are your current duties and responsibilities as a

19  counterintelligence agent in Chicago?

20  **A.**  I investigate matters related to economic espionage,

21  intellectual property crimes, computer intrusions, and

22  counterintelligence.

23  **Q.**  Is your testimony today based, in part, upon your own

24  involvement in this investigation?

25  **A.**  It is.

Borkan - direct                                                  7

1   **Q.** Is it also based on information you learned from other

2   investigating agents?

3   **A.** Yes.

4   **Q.** Is it also based on your review of documents and electronic

5   devices relevant to this matter?

6   **A.** Yes.

7   **Q.** Are you familiar with an individual by the name of Haizhou

8   Hu?

9   **A.** Yes.

10  **Q.** If Mr. Hu were before you, would you recognize him?

11  **A.** I would.

12  **Q.** Can you please look around the courtroom, and if you see

13  Mr. Hu, please identify an article of clothing he is wearing

14  and generally where he's sitting.

15  **A.** He is seated right over there in the orange jumpsuit.

16          MS. PILLAY:  All right.  Your Honor, I'd ask the

17  in-court -- the record reflect the in-court identification of

18  the defendant.

19          THE COURT:  The record will so reflect.

20  BY MS. PILLAY:

21  **Q.** Special Agent Borkan, did you participate in the

22  investigation of the defendant that led to his arrest?

23  **A.** I did.

24  **Q.** Are you familiar with the complaint detailing the facts

25  underlying the charges against him?

1    **A.** I am.

2    **Q.** Is it true -- correct that you were not the affiant to that

3    complaint?

4    **A.** That is correct.

5    **Q.** In fact, the complaint was issued in the Western District

6    of Virginia; is that right?

7    **A.** That is correct.

8    **Q.** And do you have before you a copy of that complaint?

9    **A.** I do.

10   **Q.** Is it marked as Government Exhibit Complaint?

11   **A.** Yes.

12   **Q.** And is that the complaint issued out of the Western

13   District of Virginia?

14   **A.** It is.

15   **Q.** With case number 3:20-MJ-36?

16   **A.** That is correct.

17         MS. PILLAY:  Your Honor, at this time, the government

18   moves to admit Government Exhibit Complaint, which is publicly

19   available at the docket No. 1 under the case number indicated

20   in my question.

21         THE COURT:  Any objection?

22         MR. TUNICK:  No, Your Honor.

23         THE COURT:  It is admitted.

24      (Government Exhibit Complaint received in evidence.)

25         MS. PILLAY:  Thank you, Your Honor.

Borkan - direct                                                    **9**

1    BY MS. PILLAY:

2    **Q.** Special Agent Borkan, was the defendant interviewed as part

3    of this investigation?

4    **A.** He was.

5    **Q.** When was the interview?

6    **A.** Tuesday, August 25th, 2020.

7    **Q.** And who initially handled that interview?

8    **A.** U.S. Customs & Border Protection, CBP.

9    **Q.** And what generally were the circumstances in which the

10   defendant was interviewed by the CBP officers?

11   **A.** It is my knowledge that he was interviewed as part of CBP's

12   routine border-screening procedures for outgoing passengers,

13   and that the defendant was selected for a secondary

14   examination, one of the -- as one of the outgoing passengers on

15   that flight.

16   **Q.** And where was that flight heading?

17   **A.** To China.

18   **Q.** Did you later become involved in the investigation?

19   **A.** I did.

20   **Q.** And what was your involvement?

21   **A.** During CBP's interview that day of the defendant, they

22   uncovered some information of possible federal criminal

23   violations, and they notified the FBI, and my supervisor asked

24   me to go to the airport, O'Hare, to have an interview with the

25   defendant.

1   **Q.**  Is the defendant a United States citizen?

2   **A.**  No, he is not.

3   **Q.**  Okay.  Are you familiar with the defendant's current

4   immigration status?

5   **A.**  Yes.

6   **Q.**  Okay.  What circumstances was he -- under what

7   circumstances was he originally in the United States?

8   **A.**  He came here on a J-1 visa.

9   **Q.**  And what is a J-1 visa?

10  **A.**  It is a temporary visa, usually given to exchange scholars

11  and students, to come to the U.S. for anywhere between a few

12  months to upwards of a few years.

13  **Q.**  And how long was his J-1 visa for?

14  **A.**  One year.

15  **Q.**  Where did he work while in the United States on his J-1

16  visa?

17  **A.**  He was working at the University of Virginia,

18  Charlottesville.

19  **Q.**  And, generally, what kind of work was he engaged in at the

20  University of Virginia?

21  **A.**  Sure.  He was researching a field called bio-inspired fluid

22  dynamics.

23  **Q.**  And can you explain to the Court what that means?

24  **A.**  Sure.  It's a research field in which you examine

25  biological systems or entities in order to derive lessons that

**11**

1  can be applied to physical systems, such as maritime, naval,

2  aerospace development efforts.

3  **Q.**  Things like propulsion technology on a submarine?

4  **A.**  That is correct.

5  **Q.**  Okay.  And who was his supervisor at the University of

6  Virginia?

7  **A.**  Dr. Haibao Dong.

8  **Q.**  Can you please spell that name for the court reporter?

9  **A.**  H-a-i-b-a-o, last name Dong, D-o-n-g.

10  **Q.**  And was Dr. Dong also the defendant's visa sponsor?

11  **A.**  He was.

12  **Q.**  And during the interview of the defendant, did he explain

13  what he did before he came to the United States?

14  **A.**  He did.

15  **Q.**  What was that?

16  **A.**  He was a -- most recently, a Ph.D. student at Beihang

17  University in China.

18  **Q.**  And as part of his time as a student, as a Ph.D. student,

19  was he working in a lab?

20  **A.**  In China, he was.

21  **Q.**  Okay.  What kind of lab?

22  **A.**  It was called the China State Key Lab for Fluid Dynamics.

23  **Q.**  Okay.  So did that lab -- was that similar to the lab that

24  the defendant worked at in Virginia?

25  **A.**  Yes, it was.

Borkan - direct                                      **12**

1   **Q.** And did that lab in China have any connection to the

2   government of the People's Republic of China?

3   **A.** It did.

4   **Q.** How?

5   **A.** That lab, the State Key Lab --

6           MR. TUNICK:  Judge, could I get a foundation as to

7   his knowledge to the People's Republic of China?

8           THE COURT:  Yes.  Counsel, if you can ask a few

9   more -- ask a few more questions to see the basis for this

10  information.

11  BY MS. PILLAY:

12  **Q.** And, again, is this information based on your interview of

13  the defendant and the defendant's statements to you?

14  **A.** Which statement?

15  **Q.** Okay.  We'll take a step back.  Sorry.

16          Did the defendant tell you what kind of work he did

17  in China?

18  **A.** Yes.

19  **Q.** Okay.  And did he tell you that he worked at this China

20  State Key Lab?

21  **A.** I believe he told -- to my knowledge, I know that came from

22  the interview with CBP.

23  **Q.** So he told the federal government that he worked at the

24  China State Key Lab?

25  **A.** Yes.  And I believe that was also on his visa application.

Borkan - direct                                    **13**

1   **Q.** Understood.

2           And based on your research of the China State Key

3   Lab, are you familiar whether any connection it may have to the

4   People's Republic of China government?

5           MR. TUNICK:  Again, the same objection as to

6   foundation.

7   BY MS. PILLAY:

8   **Q.** Can you please explain your understanding of China State

9   Key Lab's connection, if any, to the People's Republic of

10  China's government.

11  **A.** The defendant told CBP during his previous interview that

12  the lab was funded by the Chinese Air Force as well as the

13  China -- the Chinese version of a National Science Council --

14  National Science -- NSF, the National Science Foundation.

15  **Q.** Okay.  So returning to the August 25th, 2020 interview.

16          Did the defendant have any electronic devices in his

17  possession at the airport?

18  **A.** He did.

19  **Q.** Okay.  Can you -- or tell us which devices specifically.

20  **A.** Sure.  He had a laptop computer, two external hard drives,

21  a flash drive, an iPad, and two cell phones.

22  **Q.** And at any point during his interviews, was the defendant

23  asked if he had material on his computer that he was not given

24  permission to have?

25  **A.** He was.

1   **Q.** What did he say?

2   **A.** He stated that he had F90 files that he did not have

3   permission to have.

4   **Q.** And who -- where did -- who -- to whom did the F90 files

5   belong?

6   **A.** Dr. Dong, his advisor and sponsor at University of

7   Virginia.

8   **Q.** And during the interview, did the defendant confirm that he

9   did not have permission from Dr. Dong to have those files?

10  **A.** He did.

11  **Q.** Did agents then look at any of the electronic devices to

12  discover if there were F90 files?

13  **A.** They did.

14  **Q.** Okay.  Which device?

15  **A.** It was either the laptop or the external hard drive plugged

16  into the laptop.

17  **Q.** And what -- and were any F90 files found?

18  **A.** There were.

19  **Q.** Approximately how many?

20  **A.** A search of those devices found approximately 9600 F90

21  files.

22  **Q.** Can you just briefly explain to the Court what an F90 file

23  is?

24  **A.** Sure.  It's -- an F90 file is a pre-compilation source-code

25  file.  It's almost the raw file that a computer programmer

1   might write code that eventually gets compiled and turned into

2   a computer program.

3   **Q.**  Like an executable file?

4   **A.**  Exactly.

5   **Q.**  And did the agents interview Dr. Dong about the F90 files

6   found on the defendant's computer?

7   **A.**  They did.

8   **Q.**  And during that interview, were the F90 files found on the

9   defendant's computer shown to Dr. Dong via a videoconference?

10  **A.**  They were.

11  **Q.**  Okay.  And what, if anything, did Dr. Dong say about the

12  F90 files found on the defendant's computer?

13  **A.**  Dr. Dong stated that amongst the F90 files on the

14  defendant's electronics, there were 55, what he called

15  core-code files, and these core-code files were the most

16  important part of Dr. Dong's research in the simulation

17  program, and they comprised approximately 17 years' worth of

18  research; and that these are the core-code files that really

19  give his lab and his research a competitive advantage.

20  **Q.**  And when you said 17 years of research, whose research?

21  **A.**  Of Dr. Dong's research.

22  **Q.**  Did Dr. Dong essentially write the core code that was found

23  on the defendant's computer?

24  **A.**  Yes.

25  **Q.**  According to Dr. Dong?

1    **A.**  Yes.

2    **Q.**  Okay.  And according to Dr. Dong, who had access to those

3    specific core-code files?

4    **A.**  Only Dr. Dong and two other individuals that worked under

5    Dr. Dong in his lab.

6    **Q.**  And that did not include the defendant?

7    **A.**  It did not.

8        (Interpreter Yen reenters.)

9    BY MS. PILLAY:

10   **Q.**  And you mentioned that the -- Dr. Dong had stated that the

11   core code was -- made him more competitive.

12        Can you explain further how the core code was

13   valuable to him and to the University of Virginia?

14   **A.**  Sure.  He indicated that the core code, which is used to

15   essentially create that computer program which runs simulations

16   for his type of research, it's a program that is capable of

17   running these simulations very efficiently.  And through this

18   program, he's able to produce research at a certain caliber.

19   He called his core code in the simulation program the best in

20   the world, and it allows them to win funding.

21   **Q.**  And when you say win funding, what do you mean -- what did

22   he mean by that?  Or what did you understand him to mean by

23   that?

24   **A.**  Government funding.  For example, he cited in the last year

25   alone, he had secured approximately $1.8 million in

1   funding/grants.

2   **Q.**  Did that include grants from the National Science

3   Foundation?

4   **A.**  It did.

5   **Q.**  Okay.  And based on your research and your interview of

6   Dr. Dong, where else does he receive funding for his research

7   at UVA generally?

8   **A.**  In addition to NSF, he gets funding from --

9           THE DEFENDANT (in English):  Sorry, I cannot hear.

10       (Interpreters speaking with defendant.)

11          THE COURT:  For the record, we're going to take a

12  brief pause.  The interpreters are going to switch one to

13  another.  They are having a technical issue.

14       (Pause.)

15          THE DEFENDANT (through interpreter):  Yes, we can

16  hear them.

17          THE COURT:  All right.  Let's resume.

18          MS. PILLAY:  I'll repeat the question.

19  BY MS. PILLAY:

20  **Q.**  From where did Dr. Dong receive funding for his research at

21  University of Virginia?

22  **A.**  From the NSF as well as the Office of Naval Research and

23  other Department of Defense entities.

24  **Q.**  And are some of those Department of Defense entities

25  located outside of Virginia?

1    **A.**  They are.

2    **Q.**  And you had mentioned that the -- Dr. Dong explained that

3    he received millions of dollars in grants for his research, is

4    that right?

5    **A.**  Yes.

6    **Q.**  Did he explain what -- that the -- was the core code at all

7    relevant to his award of those grants?

8    **A.**  Yeah, he -- he indicated the core code is essentially his

9    research lab's competitive advantage; and he's worried that if

10   the core code were to leave the lab, it would compromise his

11   lab's competitive advantage.  It could be exploited by other

12   companies or countries or governments for various uses.

13   **Q.**  Where did Dr. Dong store this core code?

14   **A.**  He stored the -- those core-code files on the

15   high-performance computer, HPC, located within his lab at the

16   University of Virginia, Charlottesville.

17   **Q.**  And how was access to this core code on this

18   high-performance computer managed according to Dr. Dong?

19   **A.**  Dr. Dong managed the access list, so anyone who needed

20   access to the HPC would have to be granted it by Dr. Dong, and

21   it was administered by the university IT department.

22   **Q.**  Now, according to Dr. Dong, at any point did the defendant

23   ask for access to the core code?

24   **A.**  He did, multiple times.

25   **Q.**  And did Dr. Dong ever grant the defendant access to the

**19**

1    core code?

2    **A.**  He never did.

3    **Q.**  Why not?

4    **A.**  Again, Dr. Dong was very concerned about the core code

5    leaving his lab due to the harm it could have to his lab and

6    his research interests, and he would not grant core-code access

7    to temporary visitors.

8    **Q.**  Such as the defendant?

9    **A.**  Correct.

10   **Q.**  Did the defendant tell Dr. Dong, who was his supervisor,

11   that he was leaving Virginia to return home to China?

12   **A.**  He did not.

13   **Q.**  Did the University of Virginia have any policies concerning

14   access to computer systems?

15   **A.**  It did.

16   **Q.**  Is a relevant portion of those -- of that policy referenced

17   in the complaint?

18   **A.**  It is.

19   **Q.**  I'm directing you to page 8, paragraph 16 of the complaint.

20        Can you please read the relevant policies.

21   **A.**  Sure.  University of Virginia had a policy titled IRM-002:

22   Acceptable Use of the University's Information Technology

23   Resources, which stated, amongst other things, that the user

24   must not obtain, or attempt to obtain, unauthorized access to

25   the university's IT resources, and circumvent or attempt to

1  circumvent security controls on the university's IT resources.

2  **Q.** Did this policy apply to the defendant while he was a

3  researcher at U. of A. according to -- UVA, rather, according

4  to Dr. Dong?

5  **A.** It did.

6            MS. PILLAY:  Nothing further, Your Honor.

7            THE COURT:  Counsel, did you say it was in paragraph

8  18 of the complaint?

9            MS. PILLAY:  16 on page 8.

10           THE COURT:  16.  Got it.  Thank you.

11           All right.  Mr. Tunick, any cross-examination?

12           MR. TUNICK:  Yes, Your Honor.

13                      CROSS-EXAMINATION

14 BY MR. TUNICK:

15 **Q.** Agent, I would like to start with your statement that

16 Dr. Dong said that he was surprised that Haizhou did not tell

17 him he was leaving for China.

18           Did Dr. Dong tell you that Haizhou e-mailed him and

19 told him he was leaving for China a week before his departure?

20 **A.** I was not aware of that.

21 **Q.** Did you check Dr. Dong's e-mails?

22 **A.** I did not.

23 **Q.** Did Dr. Dong tell you that a couple days before Haizhou's

24 departure, he asked Haizhou how he was getting to the airport?

25 **A.** I was not aware of that.

1   Q.  And let's go back to how Dr. Dong actually met Haizhou Hu.

2           Dr. Dong performed a lecture in China, isn't that

3   correct?

4   A.  That is what I was made aware of, yes.

5   Q.  And what was the subject matter of his lecture in China?

6   A.  I do not know.

7   Q.  Do you know if he was talking about his research at the

8   University of Virginia?

9   A.  I do not know.

10  Q.  Do you know where he spoke in China?

11  A.  I believe it was at Beihang.

12  Q.  Beihang University?

13  A.  Correct.

14  Q.  And that is where Haizhou Hu went to college, isn't that

15  correct?

16  A.  That is correct.

17  Q.  Do you know if Dr. Dong tried to get researchers from

18  China?

19  A.  I do not know.

20  Q.  Well, in the complaint, it indicates that Dr. Dong spoke

21  about BioMix in aerodynamics.  Would that be a fair statement?

22  A.  That Dr. Dong conducted research in that?

23  Q.  And when he spoke in 2017 in China, he spoke about

24  aerodynamics.

25  A.  Yes.

1   Q.  And do you know -- you don't know what was revealed at that

2   particular lecture?

3   A.  No.

4   Q.  Now, you -- Dr. Dong told you that Haizhou Hu was a

5   researcher for Dr. Dong, correct?

6   A.  Correct.

7   Q.  And that research was from March 2019 until August 2020,

8   correct?

9   A.  Correct.

10  Q.  So Haizhou's research duties ended in August 2020, correct?

11  A.  Correct.

12  Q.  If he had no work to do at the university, why would

13  Dr. Dong be surprised that he would be leaving for China?

14  A.  Well, my understanding was the research duties ended due to

15  his departure back to China.

16  Q.  Well, when -- that's not what the complaint says.  The

17  complaint says his research ended in August 2020.  It does not

18  mention because of his departure to China.  Correct?

19  A.  The complaint does not state that.

20  Q.  The complaint does not say what?

21  A.  The sentence that you just stated.

22  Q.  Okay.

23  A.  The causality.

24  Q.  Right.  It doesn't say his research duties ended because of

25  his departure, correct?

1  **A.** Correct, it does not --

2  **Q.** It says --

3  **A.** -- state that.

4  **Q.** It says his research duties ended in August 2020, correct?

5  **A.** Correct.  There is no statement on causality.

6  **Q.** Now, do you know when Haizhou Hu's visa was scheduled to

7  terminate, the J-1 visa?

8  **A.** Yes.  It was scheduled to terminate in, originally, March

9  of 2020.

10 **Q.** And it was extended, correct?

11 **A.** That is my knowledge.

12 **Q.** To your knowledge, correct?

13 **A.** To my knowledge, yes.

14 **Q.** Do you know when it was extended until?

15 **A.** Not the exact date, I do not.  I know it was extended.

16 **Q.** Okay.  So if he had no duties at the University of Virginia

17 and his visa was scheduled to terminate, wouldn't it be

18 appropriate for Haizhou Hu to go back home at that time?

19         MS. PILLAY:  Objection, speculation.

20         THE COURT:  Are you asking what's in the mind of

21 the -- Dr. Dong?  Or are you just asking him --

22         MR. TUNICK:  Yes.

23         THE COURT:  -- to apply his own logic?

24         MR. TUNICK:  Well, I would ask that:  In Dr. Dong's

25 mind, wouldn't it -- if his duties with Dr. Dong was scheduled

Borkan - cross                                    **24**

1    to terminate, and his visa had been extended for a period of

2    time, wouldn't it be appropriate when -- for Dr. Dong to

3    believe he was going to go back home?

4            THE COURT:  I'll sustain that objection because

5    you're asking for the state of mind of another person.

6            MR. TUNICK:  Okay.

7    BY MR. TUNICK:

8    **Q.**  Well, at any rate, if an individual's visa is scheduled to

9    terminate, wouldn't it be lawful, wouldn't it be appropriate

10   not to stay in the United States after it terminates?

11   **A.**  That is correct.  It would be -- it would be lawful for

12   them to leave upon expiration of the visa.

13   **Q.**  So it's a fair statement to say that Haizhou Hu was

14   actually being lawful by not overstaying his extended visa,

15   correct?

16   **A.**  Yes, that is correct.

17   **Q.**  And he was complying with the laws of the United States

18   with respect to the J-1 visa, isn't that true?

19           MS. PILLAY:  Objection.  That's a fairly broad

20   statement based on the facts before the Court.

21           THE COURT:  Yeah.  I mean, I think it's asking the

22   witness for a legal conclusion.  It seems to me a lot of this

23   is argument.  It would be better to focus on getting the facts

24   out and then you can make arguments from that.

25   BY MR. TUNICK:

1  **Q.** Well, let's get to these F90 files.

2          The F90 files that were on Haizhou's computer, you

3  stated in -- or it's stated in the complaint there were 9600,

4  approximately, of them, correct?

5  **A.** Correct.

6  **Q.** However, you have not examined the source of all those --

7  of those F90 files, correct?

8  **A.** The source as in where they came from?

9  **Q.** Yes.

10 **A.** Correct, I have not.

11 **Q.** You can't -- did they come from the University of Virginia?

12 **A.** I can confirm, based on the interview with Dr. Dong, that

13 at least 55 of them, the core code/F90 files, did.

14 **Q.** Okay.  So -- I am going to get back to the core-code files,

15 but it's your position that at least there was 55 of the 9600

16 that came from the University of Virginia?

17 **A.** Correct.

18 **Q.** At least?  Okay.  Now, Professor Dong characterized his

19 research to you into four separate categories, correct?

20          And -- no, not to -- was it to you?  I'm not sure who

21 it was to, but he characterized his research into four

22 categories, correct?

23 **A.** Correct.

24 **Q.** There was number 1, pre-processing codes; number 2,

25 executable files; number 3, post-processing codes; and number

Borkan - cross                                          **26**

1  4, the core codes.  Correct?

2  **A.**  Correct.

3  **Q.**  Now, there's no question at all that Haizhou Hu was granted

4  access and permission to review and download the pre-processing

5  codes, the executable files, and the post-processing data.

6  That's true, correct?

7  **A.**  I do know he was granted access to some of those three

8  categories, the pre-processing, executables, and

9  post-processing.  Specifically whether he was granted access to

10  all of those types of files at Dr. Dong's lab, that I'm not

11  aware of.

12  **Q.**  Well, Dr. Dong never told you that he wasn't granted access

13  to those particular files, did he?

14  **A.**  No.

15        INTERPRETER MURPHY:  Counsel, could you repeat your

16  last question?

17        MR. TUNICK:  Judge, the interpreter asked me to

18  repeat.

19  BY MR. TUNICK:

20  **Q.**  Dr. Dong never told you that Haizhou Hu was not granted

21  access to any of the pre-processing code files, the executable

22  files, or the post-processing data files, true?

23  **A.**  Correct, yes.

24  **Q.**  So it's fair to say that none of these files were obtained

25  without authorization as per 18 U.S.C. 1030, correct?

1    **A.**  I don't think I can make that leap because we haven't asked

2    him specifically about each file on -- in his possession.

3    **Q.**  Well, let's -- let me rephrase the question, then.

4            There's no evidence that you have at this particular

5    time to say that Haizhou Hu obtained the pre-processing codes,

6    the executable files, or the post-processing data without

7    authorization, correct?

8    **A.**  That is my knowledge, yes.

9    **Q.**  It's also fair to say that at this particular time, there

10   is no evidence to say that the pre-processing codes, the

11   executable files, or the post-processing data are a trade

12   secret, correct?

13   **A.**  Correct.  I have no knowledge of its trade-secret status.

14   **Q.**  Now, at some point after COVID struck, students were

15   granted remote access to the University of Virginia computer,

16   correct?

17   **A.**  I don't know if remote access was granted due to COVID or

18   if that was always a --

19   **Q.**  Okay.

20   **A.**  Yeah.

21   **Q.**  That's a fair answer.

22           So Haizhou Hu and the other two students working for

23   Dr. Dong would have had remote access, correct?

24   **A.**  I know that the defendant had remote access.

25   **Q.**  Okay.  And so it's fair to say, then, it would be

1    incumbent -- or did Dr. Dong tell you that as a result of that,

2    Haizhou had to work on his PC to accomplish some of the tasks

3    that were assigned to him?  Would that be correct?

4    **A.**  I don't know if that topic, in particular, came up with

5    Dr. Dong in regards to how -- or under what circumstances the

6    defendant was authorized to use remote access.

7    **Q.**  Well, he wasn't working on the University of Virginia's --

8    in the lab at -- correct?

9    **A.**  You mean where was Mr. Hu physically working?

10   **Q.**  Yes.

11   **A.**  Through my interview with him, I recall him stating that he

12   would do it remotely and occasionally in person.

13   **Q.**  So this -- in the complaint, there is some mention that

14   there's a possibility that Haizhou Hu logged on to the other

15   students' computers when they walked away from their computers.

16          How is that possible if Haizhou Hu was working

17   remotely on his own computer?

18   **A.**  Again, it's not my understanding that he was exclusively

19   working remotely.

20   **Q.**  Did you ever hear any evidence that he worked alongside the

21   other two students while they were accessing University of

22   Virginia's computer?

23   **A.**  No, we never -- we never got any statement saying that he

24   was working at the same time in person at the lab with others.

25   **Q.**  And the affidavit states that Dr. Dong said that the core

**29**

1    codes were the proprietary information, correct?

2    **A.**  That is correct.

3         (Interpreter raises hand.)

4    BY MR. TUNICK:

5    **Q.**  And that the two graduate students, along with Dr. Dong,

6    were the only ones to have access to the core codes, correct?

7    **A.**  Correct.

8    **Q.**  Now, Dr. Dong said something interesting, that Haizhou Hu

9    asked the other students if he could have access to the

10   core-code information.

11        Do you recall that in the complaint?

12   **A.**  I do.

13   **Q.**  You interviewed those other two students.  They didn't say

14   that Haizhou Hu asked them for the core codes, did they?

15   **A.**  I don't recall what was explicitly asked from the defendant

16   to those two graduate students.

17   **Q.**  Did those graduate students ever mention in any respect

18   that Haizhou Hu asked for the core codes?

19   **A.**  They stated that Haizhou asked for access to the -- some

20   protected folders.  I don't know if they stated he was asking

21   specifically in the words "core code."

22   **Q.**  Well, when did Dr. Dong -- according to your testimony,

23   Haizhou Hu asked for the core codes on several occasions,

24   correct?

25   **A.**  Correct.

1   **Q.**  Did Dr. Dong ever give any dates when those were asked?

2   **A.**  Not that I'm aware of.

3   **Q.**  Did he ever give any time frame at all as to when Haizhou

4   Hu asked for the core codes?

5   **A.**  Nothing specific.  Just between March 2019 and August 2020.

6   **Q.**  Are you aware that Dr. Dong gave Haizhou Hu five of the

7   core codes so he can do simulations for his research?

8   **A.**  I know that Dr. Dong granted access to the defendant to

9   some files that he didn't previously have access to, but I do

10  not know if those files were the -- part of that 55 core-code

11  files.

12  **Q.**  And what was the reason why he granted -- Dr. Dong granted

13  Haizhou Hu access to those particular files?

14  **A.**  I believe it was for the defendant to either insert some

15  parameters or make some small changes in order to recompile the

16  program to better serve a specific experiment he was running

17  under Dr. Dong's supervision.

18  **Q.**  And that was to assist Dr. Dong, correct?

19  **A.**  Presumably, yes, correct.

20  **Q.**  Now, the affidavit also mentions that Company 1 has also

21  developed similar simulation software as Dr. Dong has

22  developed, correct?

23  **A.**  It's -- yes.  The complaint states that.

24  **Q.**  And that software is sold publicly to various vendors,

25  correct?

1   **A.**  Correct.

2           MS. PILLAY:  Your Honor, may we have a moment?  I

3   think the interpreter needs assistance.

4           THE COURT:  Yes.  We'll take a recess.

5       (Pause.)

6           THE COURT:  All right.  You may proceed, Mr. Tunick.

7           MR. TUNICK:  Thank you, Your Honor.

8   BY MR. TUNICK:

9   **Q.**  Dr. Dong looked at Haizhou Hu's computer and indicated

10  there were core-code files on Haizhou's computer, correct?

11  **A.**  Correct.

12  **Q.**  How long did Dr. Dong review those core-code files?

13  **A.**  I do not know.

14  **Q.**  Did he do a comparison to say that they were the exact

15  replica of his core-code files?

16  **A.**  I do not know.

17  **Q.**  When did Dr. Dong take a look at the core code -- the

18  alleged core-code files that were on Haizhou Hu's computer?

19  **A.**  It was either August -- well, August 27th.

20  **Q.**  And who did he do that with?

21  **A.**  He -- it was coordinated with agents, FBI agents, in

22  Virginia and Chicago, as well as Customs & Border Protection at

23  O'Hare --

24  **Q.**  Who --

25  **A.**  -- who maintained custody of the electronics.

1    Q.  And where did that take place?

2    A.  Virtually.

3    Q.  Oh, it was virtually?  He looked at the computer -- the

4    files virtually?

5    A.  Yes.  That is my knowledge.

6    Q.  Were you present as part of that interview?

7    A.  I was not.

8    Q.  Now, as you sit here today, you -- the FBI, the border

9    patrol, all the law enforcement agencies that are involved in

10   this investigation have developed -- have not developed any

11   evidence that Haizhou Hu accessed the home storage space where

12   Professor Dong's code-core files were located, correct?

13   A.  As of right now, it is my knowledge that we have not done a

14   forensic review of where those files came from.

15   Q.  However, you have posed several -- or not you, I should

16   say.  The affidavit has posed several theories as to how the

17   alleged Dr. Dong's core-code files got on Haizhou Hu's

18   computer, correct?

19   A.  Correct.

20   Q.  The first theory that was presented was that he might have

21   stole credentials from Professor Dong or the two authorized

22   students, correct?

23   A.  That's what -- yes, correct.

24   Q.  However, there is no evidence at this time that he stole

25   anybody's credentials to access those core-code files, true?

1   A.  Yes.  We have no evidence he stole credentials.

2   Q.  And, in fact, that would be pretty easy to -- evidence to

3   develop.  All you would have to do is access the very -- the

4   three individuals' computer information and you can tell what

5   has been downloaded, correct?

6               MS. PILLAY:  Objection, speculation, "pretty easy."

7               THE COURT:  Overruled.

8               The witness can answer, if he's able to.

9   BY THE WITNESS:

10  A.  Could you repeat the question?

11  BY MR. TUNICK:

12  Q.  To determine whether or not the credentials were stolen and

13  the core-code files were downloaded from those stolen

14  credentials, that would be pretty easy to determine

15  forensically, wouldn't it?

16  A.  It depends -- each circumstance could be different.

17  Depends on the logging on each computer of each student, the

18  type of logging enacted on the server from which they're

19  logging into.  It could be easy or it could be impossible.

20  Q.  I assume that law enforcement has looked at those

21  particular credentials to see whether or not any downloading of

22  core-code files has taken place.  True?

23  A.  I do not know.

24  Q.  Was there dates on the files that were the alleged

25  core-code files?  Was there any dates on those?

1    **A.**  I didn't see the -- I wasn't present for the review of

2    those core-code files, but just based on computer forensics,

3    there would be dates within the computer associated with those

4    files.

5    **Q.**  So that would actually be very easy to go back and

6    determine whether or not anyone's credentials were stolen if --

7    by the dates, correct?

8    **A.**  I would not be relying on dates to determine that.

9    **Q.**  Well, although the -- that evidence, apparently, has not

10   been developed, there should be a clear forensic trail if that

11   was the case.  True?

12   **A.**  Again, there could be a forensic trail of evidence of, I'm

13   sorry, credentials being stolen and used elsewhere, but it's

14   also equally possible that there is no forensic evidence of

15   that.  I do not know in this particular case.

16   **Q.**  Well, regardless, at this particular point in time, law

17   enforcement has not developed any evidence that Haizhou Hu

18   stole credentials in order to download those core-code files at

19   this particular time, correct?

20   **A.**  That is my knowledge, correct.

21   **Q.**  The second theory that was posed in the complaint was by

22   accessing the core-code files when a person with authorized

23   access walked away from their computer.

24        That's in the complaint, correct?

25   **A.**  That is.

1    Q.  And, again, most of the work at that -- at least, you know,

2    subsequent to March was done remotely, correct?

3    A.  I'm -- I do not know the breakdown between remote versus in

4    person.

5    Q.  Okay.  Has there been any evidence developed at all that

6    Haizhou Hu worked alongside the other two students that were

7    granted access to the core-code files?

8    A.  No.

9    Q.  And, again, even if that was the case, most likely there

10   would be a forensic trail showing that the core-code files were

11   downloaded from a particular authorized individual, correct?

12   A.  Again, it would depend on the electronic device and the

13   information resource whether any forensic trail existed.

14   Q.  The third theory that was posed in the complaint as to how

15   the alleged core-code files got on Haizhou Hu's computer was

16   other methods such as a password-cracking tool or back into the

17   space where the core code was stored.

18         That's the third theory that was posed, correct?

19   A.  Correct.

20   Q.  And, again, there's no evidence at all that there was a

21   password-cracking tool that was used to access the space where

22   the core codes were stored, correct?

23   A.  Correct.

24   Q.  And it's fair to say that would be a pretty difficult task

25   to crack that code?  Wouldn't that be a fair statement?

1   **A.** No.  It would depend on the password itself and the

2   complexity.  It could be trivial.  It could take hundreds of

3   years.

4   **Q.** Okay.  Well, regardless, there's -- you've -- at this

5   particular point, there's no evidence that the University of

6   Virginia computers were hacked into on a particular date and

7   time, correct?

8   **A.** Correct.

9   **Q.** Now, with respect to the confidentiality of this -- let's

10  just talk about the F90 files.

11         The core codes are also an F90 file, correct?

12  **A.** Yes.

13  **Q.** Okay.  Was there ever a confidentiality agreement that

14  Haizhou Hu was asked to sign?

15  **A.** I don't believe so.

16  **Q.** Was there ever a proprietary notice that was given to

17  Haizhou Hu at any time?

18  **A.** I believe each time a University of Virginia user logs on

19  to the system, there is some sort of a banner warning.

20  **Q.** Well, that's the one that's in the complaint, correct?

21  **A.** I'm not sure if the banner warning is the same one that's

22  in the complaint.

23  **Q.** It basically states that the University of Virginia network

24  is available for authorized use only, correct?

25  **A.** Yes, that's what that states.

1    **Q.** And it does -- it says it's subject to the policies of the

2    University of Virginia, correct?

3    **A.** Where are you reading that from?

4    **Q.** It's -- I'm reading from my notes, actually, but it

5    states -- it states all traffic and actions are subject to

6    university policies, correct?

7    **A.** Sorry.  I don't have any -- I don't have that in front of

8    me.

9    **Q.** You don't -- you don't have the complaint in front of you?

10            MS. PILLAY:  I'm sorry, Your Honor.  May I have a

11   quick recess?  I just -- I've been asked to call the

12   prosecutor.

13            THE COURT:  Yes.  We'll take a short recess.

14            MS. PILLAY:  Thank you.

15            THE COURT:  And while we're doing that, you, Agent,

16   don't have the complaint in front of you?

17            THE WITNESS:  I do, but that specific language, he

18   doesn't have the same -- or he's got his notes.  He can't tell

19   me where he's reading from.

20            THE COURT:  Okay.

21            MR. TUNICK:  Judge, why are we taking a recess?

22            THE COURT:  Ms. Pillay asked to take a recess because

23   she has to take a call.  So I granted that request.

24            MR. TUNICK:  Judge, my --

25            THE COURT:  I am going to step out for five minutes.

1  Feel free to stretch as long as you maintain social

2  distancing.

3  (Recess.)

4  THE COURT:  All right.  We'll resume.

5  MS. PILLAY:  Thank you, Your Honor.

6  I have asked Agent Borkan to return to the table

7  because -- and I just informed Mr. Tunick -- I actually

8  received a call from the prosecutor in Virginia.

9  In the course of their continuing investigation and

10  working with the university, one of the critical computers on

11  which this information was stored had crashed.  And so they had

12  been waiting for the computer to be repopulated, which has been

13  done, and they are now over there right now, and it turns out

14  some portion of what was found on Mr. Hu's computer that they

15  were concerned was proprietary is in a shared space that Mr. Hu

16  had authorized access.

17  As a result, and based on my conversation with the

18  prosecutor in Virginia, we are going to seek dismissal of

19  the -- they will seek dismissal of the complaint in Virginia.

20  As a result, the government seeks dismissal of the removal

21  proceedings and, of course, release of the defendant.

22  THE COURT:  All right.  Anything, Mr. Tunick, you

23  want to say?

24  I assume you are not opposed to the government's

25  request to dismiss the removal complaint, the criminal

1    complaint that is pending in Virginia?

2            MR. TUNICK:  Of course not, Judge.

3            I would just hope that he'd be released today.  And I

4    have his belongings.  And I'm very happy that based on that

5    information, we can -- Mr. Hu can be released, yes.

6            THE COURT:  All right.  And so the government's

7    motion to dismiss the removal complaint is granted.

8            The detention hearing, of course, is not necessary.

9    Government's no longer seeking to detain.  So I will order that

10   the defendant be released after processing.

11           I can enter that docket entry immediately.  And so,

12   hopefully, if we can get that docket entry, I think he will be

13   released today, and I'll certainly do what I can to make sure

14   that happens.

15           MR. TUNICK:  Thank you, Judge.

16           THE COURT:  Is there anything further that anybody

17   wants to raise?

18           MS. PILLAY:  No.  Thank you very much, Your Honor.

19           THE COURT:  All right.  Thank you, everyone.

20       (Proceedings concluded.)

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5          I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    proceedings had in the above-entitled case before the

8    HONORABLE SHEILA M. FINNEGAN, one of the Magistrate Judges of

9    said Court, at Chicago, Illinois, on September 18, 2020.

10

11

12          _/s/ Colleen M. Conway, CSR, RMR, CRR_      _09/19/20_

13                Official Court Reporter              Date
                United States District Court
14            Northern District of Illinois
                    Eastern Division
15

16

17

18

19

20

21

22

23

24

25